IN RE THE WILL OF JAMES WILLIAM ROSE, DECEASED

No. 7523SC432

(Filed 17 December 1975)

**1. Wills § 22— caveat — mental capacity on date will executed**
    In this caveat proceeding, the trial court erred in permitting witnesses who had not seen decedent within a month of the date the

In re Will of Rose

will was executed to express opinions as to decedent's mental capacity to execute the will on that particular date since the witnesses' opinions should have been limited to the time when they had the opportunity to observe decedent.

**2. Wills § 23— caveat — mental capacity — instructions**

The trial court in a caveat proceeding erred in giving the jury an instruction which placed on the caveators the burden of showing that testator was lacking in *all* of the elements of mental capacity essential to the making of a will.

APPEAL by caveator from *Wood, Judge.* Judgment entered 27 March 1975 in Superior Court, YADKIN County. Heard in the Court of Appeals 17 September 1975.

Decedent died on 8 September 1974. A purported will executed by decedent on 19 March 1974, leaving all of his property to the First Baptist Church of Arlington, was probated in common form. Caveator, mother of decedent and the sole beneficiary of a purported will executed by him on 22 November 1972, filed a caveat.

Testimony from the caveator's witnesses tended to show the following.

For several years prior to his death, caveator's son, the decedent, had been an alcoholic. He was treated by several doctors and hospitalized a number of times for alcoholism. He was admitted to the hospital on 8 December 1972 and released on 6 January 1973. At the time of that admission his abdomen was full of fluid, he was deeply jaundiced and in a semi-coma for some time. He had been hallucinating, hearing voices and seeing things.

When he was discharged from the hospital in January, 1973 he was released in the care of his mother who took him to her home. He was placed on medication that caused him to become ill if he used alcohol. His mother had the prescriptions for the medicine filled. His mother took him to the doctor every two weeks until about 11 September 1973. In early 1974 decedent started drinking again. During these drinking episodes he would become profane and abusive to his mother. Decedent was not married at the time and his mother cooked and cared for him. Finally, about the first of February, 1974, because of excessive drinking and the consequent senseless conduct, it was necessary to admit him to the Veteran's Hospital in Salisbury. After several weeks there he was, on 8 March 1974, again released in

the care of his mother. He stayed with his parents most of the time and would, on occasion, go to a house trailer where he formerly lived. He was violent to his father and other members of his family. On 15 March 1974 he got a gun and threatened to shoot his father. He was arrested but later released when his mother signed his bond. He stayed drunk about all the time from the 15th until the last of March, 1974, when he was again admitted to the Veteran's Hospital. Both of decedent's parents were old. His sister usually went to their home every day. She saw decedent threaten and run their parents out of the home on several occasions. He tried to beat his sister. On 19 March 1974 the sister saw decedent at his mother's home. The mother was trying to get decedent sober because, among other reasons, he was supposed to be in court on the 20th as a result of the assault on his father. Decedent promised his mother that he would leave, quit drinking and go to court. Instead, decedent went to a law office and stayed several hours. Decedent did not go to court on the 20th but did show up at his parents' home on the following day and again began to be profane and abusive to his mother. His sister was there at the time and when he threatened to beat her she escaped by crawling out of a window. Several days later he went to his sister's house and although he was still drinking, he was not abusive. While there he ate some food and went to sleep. On 28 March 1974 he was again admitted to the Veteran's Hospital where he remained for about a month. He didn't stop drinking after he returned from the hospital until he died several months later. At the time of his death he was 45 years old.

Decedent tended to "go from one person to another." On the occasions when he "turned on" his mother he would get along with his father. When he was sober he was very good and kind to the members of his family. He helped his mother with her garden and was affectionate to other members of his family. Both the mother and decedent's sister testified that on 19 March 1974, the date that the will was purportedly executed, in their opinion, deceased did not have sufficient mental capacity to know and understand the nature and extent of his property, to know the natural objects of his bounty and to realize the full force and effect of disposition of his property by will.

A doctor testified that when decedent was unable to control his consumption of alcohol his judgment was impaired in every way and that it would take several weeks without alcohol for him to make a proper judgment.

Propounder offered three employees of the law firm that prepared the will. All of them had known decedent prior to the date of the execution of the will and saw decedent on 19 March 1974. All of them responded in the affirmative when asked if it was their opinion that on 19 March 1974 decedent possessed "sufficient mental capacity to know what property he had; who his relatives were; and what claims they had upon him; whether he was capable of disposing of his property by will; and understanding all of the consequences and effects of so doing."

Propounder also offered a number of witnesses from the community, including several trustees and members of the First Baptist Church of Arlington. When they were asked the foregoing question they responded with answers such as "he was capable of carrying on his business," "he was capable," and "could handle his business," and "knew what he was doing." Most of these witnesses had not seen decedent on the day he is said to have executed a will and most of them could not say that they had seen decedent during the month of March. Although most of them said they knew decedent had a drinking problem, few of them said they had ever seen him when he was drinking.

The jury found that the will of 19 March 1974 was properly executed by decedent and that he had sufficient mental capacity to make a will. Judgment was entered admitting the will to probate in solemn form.

*Randleman, Randleman & Randleman, by J. Michael Randleman, for propounder appellee.*

*Franklin Smith, for caveator appellants.*

VAUGHN, Judge.

[1] A number of caveator's assignments of error arise out of of the following. Other than those who saw decedent in the law office on the day the purported will was executed, most of propounder's witnesses could not say that they had seen or talked with decedent within a month of the time the will was executed. In substance, the following question was asked of each of them:

" . . . based on your conversations with him, and observations I ask you if you have an opinion, satisfactory to yourself, as to whether James Rose possessed *on March 19, 1974,*

sufficient mental capacity to know what property he had; who his relatives were; and what claims they had upon him and whether he was capable of disposing of his property by will; and of understanding the consequences and effect of so doing?" (Emphasis added.)

Caveator promptly objected to these questions, the objections were overruled and the witnesses were allowed to answer.

Caveator readily concedes that the witnesses could state their opinions of decedent's condition as of the time they had the opportunity to observe him. It is also clear that the opportunities of the witnesses to observe decedent were close enough to the date of the alleged execution of the will so as to make their opinion of his condition, at the time they saw him, relevant on the question of his condition at the time of the execution of the purported will. The objection, as we see it, is that the questions called for the witnesses' opinion of decedent's condition on the specific day of 19 March 1974, a day when they did not have the opportunity to observe decedent. The jury, of course, could infer that decedent was competent on the day in question from testimony that he was competent a month before or after. We believe, however, that this is an inference for the jury and not for the lay witnesses. The prejudice is compounded when, as here, the judge then recapitulates the testimony of each witness to the effect that, on the date the purported will was executed, the decedent was competent. The witnesses' opinion of decedent's condition should have been limited to the time when they had the opportunity to observe decedent. This is particularly true since decedent's mental disability, if any, was a consequence of his excessive use of alcohol over a long period of time and the degree of that disability apparently varied with the time and amount of alcohol ingested.

[2] At least one of caveator's assignments of error to the charge must be considered as well taken. In his mandate on mental capacity the judge instructed the jury:

"I instruct you as to this second issue that if the Caveators, that is Mrs. Etta Rose, if she has proved to you by the greater weight of the evidence that on March 19, 1974, that the deceased, James W. Rose, lacked sufficient mental capacity to know the kind and nature and extent of his property or to know the natural objects of his bounty or to understand the legal consequences of the Propounders'

---

In re Will of Rose

---

Exhibit 1, the purported last will and testament of James W. Rose, I say to you, ladies and gentlemen, if the Caveators *so proved those things* to you by the greater weight of the evidence, then you ought to answer that second issue in their favor." (Emphasis added.)

The emphasized portion thus placed on the caveators "the excessive burden of showing that testator was lacking in *all* of the elements of mental capacity essential" to the making of a will. *In re Will of Shute*, 251 N.C. 697, 111 S.E. 2d 851. All the elements of testimentary capacity are essential to make a will and the lack of any one of them renders one incapable of making a will. It may well be that the omission of the critical words "either of" preceding "those things" is due to an error in the transcription. We must nevertheless take the record as we find it. It is certainly true that just before the emphasized portion of the quoted part of the charge the judge had properly instructed the jury as to the essential elements of testamentary capacity. This does not nullify the erroneous instruction. "Where instructions in regard to a material matter are conflicting, one erroneous and the other correct, a new trial must be granted, for the jury is not supposed to know which one is correct and this court cannot say that they did not follow the erroneous instruction." *In re Will of Shute, supra.* Moreover, not all of propounder's witnesses testified that decedent possessed all the evidence of mental capacity to make a will.

In light of the foregoing, we cannot say that the trial below was free from errors prejudicial to the caveator. Since we hold that there must be a new trial we do not discuss any of the numerous other assignments of error brought forward on this appeal.

New trial.

Chief Judge BROCK and Judge MARTIN concur.