In re Will of Cromartie

IN THE MATTER OF THE WILL OF JULIUS CROMARTIE, Deceased

No. 824SC362

(Filed 20 September 1983)

**1. Wills § 22.1— opinion testimony as to mental capacity**

The trial court in a caveat proceeding erred in permitting a witness who had not observed testator during the month in question to state his opinion that testator had sufficient mental capacity on the date he executed a will to make a disposition of his property since (1) it is improper for a witness to state an opinion as to testator's capacity to make a valid will and (2) the opinion of a nonexpert as to mental capacity must be based on his own observations and is limited to the times he observed the subject.

**2. Wills § 22.1— opinion testimony as to mental capacity**

The trial court in a caveat proceeding erred in refusing to permit lay witnesses for the caveators to state opinions as to testator's mental state because the date in each question was the date that each witness observed and talked with testator rather than the date the will was executed.

**3. Evidence § 29.3— hospital records—necessity for authentication**

G.S. 8-44.1 merely eliminated the necessity of taking original hospital records to court and did not modify the requirements for authentication of such records. Therefore, in order for hospital records to be admissible in evidence, it must be shown that the records or entries were made in the regular course of business at or near the times of the transactions involved and are genuinely what they purport to be.

**4. Evidence § 29.3— authentication of hospital records**

The key to authenticating hospital records is not personal knowledge by anyone of particular entries or occurrences but is evidence of system and practice.

APPEAL by caveators from *Winberry, Judge.* Judgment entered 12 February 1981 in Superior Court, SAMPSON County. Heard in the Court of Appeals 15 February 1983.

In his 83rd year, Julius Cromartie died on March 16, 1975 in the Veterans Administration Hospital in Fayetteville. He was first admitted to this hospital five months earlier on 18 October 1974. Twenty-four days later, he purportedly executed the will in question by putting his mark thereon in the presence of witnesses after it was read to him. Thirty-three days later, on 14 December 1974, he was released from the hospital, but was readmitted five days later and stayed there the remaining eighty-five days of his life.

The alleged will devised all the testator's property to his niece, the propounder, and upon it being presented for probate, various of his heirs and next of kin filed a caveat alleging the testator's lack of mental capacity and the propounder's undue influence.

During the trial, much non-expert testimony as to the testator's mental status was admitted into evidence, other such testimony was rejected, and excerpts from the hospital records of the testator's two admissions to the Veterans Administration Hospital offered into evidence by the caveators were rejected, though both contained recitals of his confusion and senility. The jury found the *devisavit vel non* issues in favor of the propounder.

*Jeff D. Johnson, III for caveator appellants.*

*John R. Parker for propounder appellee.*

PHILLIPS, Judge.

Though caveators present fourteen questions for our consideration, they can be distilled into the following: Did the court err (1) in receiving into evidence improper, non-expert opinion testimony as to the testator's mental capacity; (2) in refusing to admit proper testimony of that type favorable to the caveators; and (3) in refusing to admit into evidence portions of the testator's hospital records? We answer the first two questions in the affirmative and the third in the negative.

[1] Propounder's witness, Roland Autry, who did not see the testator during November, 1974, but did see him in October, was permitted, over objection, to answer the following question: "do you have an opinion satisfactory to yourself as to whether or not on November 11, 1974, he had sufficient mental capacity to make a disposition of his property?" The question was improper for two reasons. First, it was tantamount to asking him whether he had an opinion as to testator's capacity to make a valid will. "In will cases it is improper to ask a witness's opinion of the testator's capacity to *make a will*, since this assumes the witness's knowledge of the legal standard of testamentary capacity, though questions incorporating the component parts of that standard are permissible." 1 Brandis N.C. Evidence § 127, pp. 489-90 (2d ed.

In re Will of Cromartie

1982). (Emphasis in original.) Second, while jurors often have to draw inferences that mental capacity did or did not exist at a certain time from evidence as to one's condition at other relevant times, and it is appropriate for expert medical witnesses to do so under certain conditions, non-expert witnesses are not permitted to do so. Non-experts cannot express opinions about situations, hypothetical or otherwise, of which they have no personal knowledge; their opinions as to mental capacity must be based on their own observations and are limited to the time or times that they observed the subject; they cannot properly testify to one's mental capacity or condition at some other time. *In re Will of Rose,* 28 N.C. App. 38, 220 S.E. 2d 425 (1975), *disc. rev. denied,* 289 N.C. 614, 223 S.E. 2d 396 (1976). Propounder's witness, Fairley Newton, who did see the testator on the day stated, was also permitted to answer the same question, so his testimony was improperly received for only one reason.

[2] Several lay witnesses for the caveators were not permitted to answer a number of opinion questions as to the testator's mental state because the date used in each question was the date that each witness observed and talked with testator, rather than the date the will was executed, when none of the witnesses saw him. Apparently, both the court and counsel for the propounder were under the impression that the date of the will had to be used in the questions, since the ultimate issue for determination was the testator's mental capacity on that day. But issues have no effect upon the knowledge of witnesses.

Glenn Edward Boykin saw the testator in the hospital; Henry Lee Treadwell and Lula Cleo Crenshaw saw him shortly before the testator went to the hospital the first time and immediately after his release from the hospital; and Clarence Herring saw him in December, 1974, between the two hospital admissions. From the observations testified to, all of the witnesses were clearly qualified to form and express an opinion as to the testator's mental capacity as of the times when they saw him. Nevertheless, these witnesses were not permitted to answer questions as to their opinion of the testator's mental capacity at the times they saw him "to understand what he was doing," "to understand the nature and effect of making a will," "to understand the extent of his property," "to understand the nature and effect of his act in making a will," and "to understand who the people were that he

naturally should consider in determining who to leave his property to." Though some of these questions do not state in precise law book form one of the three elements of testamentary capacity, as questions in will cases often do, all of them sought to elicit information that was relevant and material to the issue involved and the witnesses' answers to them should have been received into evidence.

While opinion questions used in will cases have tended to become stereotyped in the precise language of the technical elements that comprise testamentary capacity, the law does not require that such questions be always so worded. Different expressions that serve the same purpose are permitted and in our view should be encouraged when they are simpler and more readily understandable than more technically-worded questions, which often confuse the witness and fail to enlighten the jury.

[3] In trying to get portions of the testator's hospital records admitted into evidence, caveators proceeded upon the theory that the foundation required by *Sims v. Charlotte Liberty Mutual Insurance Company*, 257 N.C. 32, 125 S.E. 2d 326 (1962) was dispensed with by the enactment of G.S. 8-44.1 in 1973. In refusing to admit the records, the trial judge ruled that the requirements stated in *Sims* still abide. We agree.

The *Sims* rule, though well grained into our law now, is but a court-devised modification of the much earlier court-adopted business records exception to the rule against hearsay. Under this exception, business records, subject to being duly authenticated and otherwise admissible, have been received into evidence by the courts of this state since 1905, and perhaps earlier. To qualify, there must be evidence that the records or entries were made in the regular course of business at or near the times of the transactions involved and are genuinely what they purport to be. The rule applies to records of all kinds, including medical, hospital, and government records. *See* 1 Brandis N.C. Evidence § 155 (2d ed. 1982). G.S. 8-44.1, enacted eleven years after *Sims*, the first decision of the North Carolina Supreme Court to explicitly hold that the business exception embraces hospital records, too, reads as follows:

> Copies of hospital records in connection with the treatment of any patient or the charges therefor shall be received

as evidence, if otherwise admissible, in any court or quasi-judicial proceeding if testified to be authentic by a person in the hospital whose duty it is to have charge or custody of such records.

This statute, quite clearly, we think, merely eliminated the necessity of taking original hospital records to court, where they were often kept for long periods to the dismay of record keepers and the inconvenience of those who needed to use the records for any purpose, including the later treatment of the patient. It did not modify the then-existing process of authenticating hospital records, which included the steps referred to in *Sims;* but, to the contrary, it ratified and reinforced the process by continuing to require authenticating testimony. For authentication in the law of records is more than identification—it is the process by which records are rendered legally admissible into evidence. *See* Black's Law Dictionary 168 (4th ed. 1968); 7A C.J.S. 911 (1980); 32 C.J.S. *Evidence* § 728, pp. 1042-43 (1964).

[4]  Thus, it is still the law that before a hospital record, even if otherwise admissible, can be received into evidence, there must be proof not only that it is what it purports to be, but also that it was made and kept in the manner that makes records reliable evidence in the first place. But neither *Sims* nor any other decision requires that the authenticating proof be only by personal knowledge. Such a requirement would, of course, for all intents and purposes, abrogate the use of business records in court; because under the conditions that most businesses and hospitals are conducted today, it is a rare person, indeed, that has personal knowledge of any work or undertaking done by others. Of necessity, therefore, the key to authenticating hospital records is not personal knowledge by anyone of particular entries or occurrences, but evidence of *system* and *practice*; evidence that a business-like system of compiling records exists, which requires that entries be made at or near the time involved by those who examine, observe, test and treat patients; and that in practice the system is generally followed. When that is testified to by someone familiar with the system, and the purported record involved, or a copy of it, is testified to be genuine, the authenticating process is as complete as the circumstances reasonably permit and the law requires. And, of course, when a record as a whole is so authenticated, that an entry here or there was not made prompt-

ly after the event recorded is no ground for rejecting the entry altogether; that would only affect its weight. It is a matter of common knowledge among those familiar with hospital records that entries requiring dictation and transcription are done late by many doctors because they give priority to their other medical duties. Nevertheless, such entries, when regularly made, are still parts of the patients' record and should be so considered, except when there is evidence of duplicity or bad faith.

The case is returned for a retrial in accord with this opinion.

New trial.

Judges ARNOLD and BECTON concur.